**MISSOURI PACIFIC RAILROAD COMPANY et al., Appellants,**

v.

**Linda Lou ROSE, by Next Friend, et al., Appellees.**

**No. 14143.**

Court of Civil Appeals of Texas.

Houston.

May 28, 1964.

Rehearing Denied June 18, 1964.

Murfee, Hoover & Stillwell, Monroe Northrop, Houston, W. M. McDowell, W. M. Dowdy, Dallas, of counsel, for appellants.

W. W. Watkins, Curtiss Brown, W. James Kronzer, Houston, Ralph W. Gilbert, Angleton, Hill, Brown, Kronzer, Abraham, Watkins & Steely, Houston, of counsel, for appellees.

BELL, Chief Justice.

Linda Lou Rose, an eight year old girl, through next friends and guardians, Charles E. Rose, Jr., et ux., brought suit against Missouri Pacific Railroad Company and W. E. Smith, one of the Railroad employees, to recover damages for injuries sustained by her when an automobile driven by her father was in collision with a "gondola" car of the Railroad Company at a point in the City of Angleton where the railroad lines cross State Highway 288. The collision occurred about 3:20 a. m. on June 1, 1961. In the collision the child's mother and father, three of the Rose children and a friend of the Roses' were killed. Suit was brought on the cause of action based on the personal injuries to Linda Lou and also on her cause of action for damages for the loss of her parents. After the jury verdict the court granted severance as to the cause of action for damages for loss of her parents and granted a new trial as to it. Based on the jury verdict, insofar as it involved the cause of action for injuries to Linda Lou, the court rendered judgment against appellants, jointly and severally, for compensatory damages in the amount of $125,000.00 and exemplary damages against the Railroad Company in the amount of $75,000.00.

Highway 288 runs from the City of Freeport to the City of Houston, in a south-north direction. It has four lanes for traffic. It is 56 feet in width at the place where the collision occurred. The Railroad, at the points here material, runs generally in an east-west direction. At its crossing with Highway 288 it crosses at a slight angle. The speed limit on the highway at and approaching the crossing is 30 miles per hour. The crossing is in the City of Angleton. At the crossing the railroad has red flasher signals to warn travelers on the highway of the approach of trains. There are ordinary street lights in the area near the crossing and also in the area shortly away from the crossing erected on fairly tall poles are stronger lights. These high bright lights are away from the crossing but would be east of

the crossing and between the crossing and the point from which the train would approach. We note these stronger lights erected about the height of a locomotive headlight because of the distinct possibility of a traveler not being able to distinguish between them. Too, we mention such street lighting because of the distinct possibility of the blending of the locomotive light with the surrounding lights.

The basic general theory of recovery is that the defendant Railroad Company had a block signal system that supposedly controlled the movement of its trains across the highway in question that was so designed and operated that it would not give adequate warning to the traveling public of the presence or approach of trains crossing the highway. The negligent operation of the system, appellees contend, made it necessary that the Railroad afford devices other than the red flasher signal at the crossing to warn the public of the approach of trains and the Company failed to provide necessary warning.

To understand the case it is necessary to review, by way of summary, the evidence as to the operation of the block signal system and particularly its relation to the red flasher signal at the crossing.

The main line of defendant Railroad Company runs through the City of Angleton. To the west of the point where the tracks cross the highway at a distance of about 500 or 600 feet the Houston and Brazos Valley main line crosses the main line of defendant Railroad. The H. & B. V. line runs in a north-south direction. There are block signals throughout the area surrounding the railroad intersection that are designed to protect against collisions between trains of the two railroads as well as to protect trains engaged in switching operation in the Angleton area from other trains of both companies that might come into the switching area on the main line. The signals can be set by remote control from a Central Traffic Control (CTC) office maintained by the defendant Railroad Company at Vanderbilt, Texas. When the signals are thus set, they must be changed by the CTC operator. Too, it is noted that if the top disc on a signal is red and a train passes both the lower and top discs become red. Until only a short time prior to the collision in question the CTC office had been in Angleton. When a train is engaged in switching operations, as was the train here involved, its crew can obtain from CTC what is known as "track and time" within a given area. This means that a member of the crew, by telephone, calls the CTC operator and asks for, and is given, "track and time." When such is given the CTC operator by remote control turns all signals surrounding the area, within which switching is being done, to a red color. This means that all trains coming into the area must stop, call the CTC operator, and get clearance before entry.

In Angleton 64½ feet east of the east curb line of Highway 288 is a signal block known as an A-Block. It is an absolute interlocking block. It is on the main line of defendant Railroad Company. The signal facility attached to it consists of two discs on the upper reach. The top disc controls movement of trains on the main line, except for those engaged in switching. When the top disc is red, such a train must stop and get clearance to proceed from the CTC operator. When a train has track and time the disc will be red. The lower disc controls the movement of a train on track and time. If it is lunar in color this gives clearance to the train on track and time to proceed without stopping. The lunar color also shows that the switches are properly aligned so the switching train may be assured of going into the proper siding from the main line. If, however, both the lower and upper discs are red all trains are supposed to stop and get clearance from the CTC operator before proceeding. This last statement is subject to one of the disputed issues in this case, that is, whether a certain directive of the trainmaster for defendant authorized the running the red over red condition of the interlocking A-Block after a train on track

and time had stopped, without getting a clear signal from the CTC operator.

In addition to controlling the movement of trains the interlocking A-Block signal, which is A-Block No. 3203 is wired electrically with the flasher control signals at the highway crossing. If the lower disc is lunar regardless of the color of the upper disc, when a train passes a point about 2700 feet east of the crossing the flasher control signal at the crossing at Highway 288 will be activated. If, however, both discs on A-Block 3203 are red (The expression red over red is used in the record to describe this condition) the flasher signal at the crossing, which is of course placed there to warn highway travelers of the approach of trains, will not be activated until some time after the activation point located at A-Block 3203 is reached. We used the expression "some time after" because there is evidence showing a four seconds lag is contemplated by defendant between the time of reaching the activation point and actual activation of the flasher signal at the crossing. The signal system thus has a dual purpose, that is, to be so operated as to protect defendant's and H. & B. V. trains and also activate flasher control signals at highway and street crossings.

There is evidence that prior to 1957, when the discs of A-Block 3203 were red over red, a train approaching was required to stop and then telephone the CTC operator for clearance and could not proceed until it was given a clear signal. When the clearance was given by the CTC operator, this would activate the flasher signal also. Here we should note that there are A-Blocks that are not interlocking. They are the A-Blocks controlling traffic entering into a switch or siding. A-Block 3203 was an absolute interlocking block affecting traffic intersecting another railroad. Prior to 1957 a train approaching an absolute block, as distinguished from an interlocking block, could stop and proceed slowly without getting clearance from CTC. This was not true, however, as to an absolute interlocking

block. As to an interlock the train was required to stop when the discs showed red over red and remain stopped, until a clear signal was given by the CTC operator and also a flagman would be sent west to the H. & B. V. intersection if the red over red was on an interlock.

In 1957 Mr. J. B. Hobbs, the trainmaster at Kingsville, sent a directive to the CTC operators at Vanderbilt and Angleton, the Train Dispatchers at Kingsville, and the Trainmen and Enginemen. The directive reads as follows:

"We are having too many serious delays to important trains resulting in considerable amount of unnecessary overtime, as well as the delay, account not being properly understood by all concerned the requirements of Rule 375 and 402 in the handling of track and time limits in C.T.C. territory.

"I want all concerned to read Rules 375 and 402 and get lined up on the proper method of handling trains in C.T.C. territory when granted track and time limits."

It is appellees' position that this directive authorized and directed that trains on track and time not stop when the signal discs were red over red and get clearance from the CTC operator before proceeding, but to disregard the red lights and proceed slowly through them after stopping. The position of defendant Railroad is that the directive referred only to ordinary A-Blocks and not the interlocking type such as No. 3203, and that under the operating rules and State law a train may not proceed through an interlocking block showing red over red but must get clearance from the CTC operator or stop and send a flagman to the intersecting railroad tracks. Operating Rule 402, which is so much referred to in the record and which the directive called to be observed, is not in evidence. We gather from the record, however, that it provided that trains on track and time need not at ordinary A-Block signals, when the discs

were red, get clearance from the CTC operator but could proceed after first stopping at the signal. Whether Rule 402, which apparently dealt with switching by trains on track and time, purported to cover absolute interlocking blocks, is not clear to us. More observations concerning this will be made later. Suffice it here to say appellees contend the directive of Mr. Hobbs, as shown by all the evidence, does cover both the ordinary and interlocking block signals.

Shortly after the dissemination of Mr. Hobbs' directive in 1957, Mr. U. C. Waigand, a signal maintainer for the defendant Company at Angleton, wrote Mr. G. J. Heidemann, the signal supervisor at Kingsville. The letter is as follows:

"This is to call your attention to Circular D-18 of January 18, 1957, by J. B. Hobbs.

"You will note that it is merely a general statement and gives no details. From what we hear we gather that Mr. Hobbs wants trains to be operated by the unrestrained use of Rule No. 402.

"Perhaps that should not be any concern of ours in the Signal Department, however, from past experience I know that we can look forward to switches being run through which is of concern to us. Also, the fact that crossing signals very often do not operate as intended when trains run red signals is another thing that can cause trouble that would require an explanation from us. Was wondering whether Mr. Hobbs has taken into full account the following part of Rule No. 402, 'Rules 104(a), Rule 104(c), etc.'

"Also whether he is aware of the fact that the part which reads 'to hold track limits for the time, etc.' is not actually true as applied to dual control switches in that by putting switch on hand throw and leaving lined to side track does not hold all signals red within the track limits."

Following receipt of the letter, Mr. Heidemann discussed it with Mr. Hobbs. Mr. Hobbs then wrote Mr. Waigand the following letter:

"Referring to your letter to Mr. G. J. Heidemann at Kingsville January 21, 1957, calling his attention to my circular D-18 of January 18, 1957, in which you stated 'You will note that it is merely a general statement and gives no details. From what we hear we gather that Mr. Hobbs wants trains to be operated by the unrestrained use of Rule 402.'

"Rules 375 and 402 referred to in my Circular D-18 of January 18, 1957 are very plain and clear and is what is required by the Missouri Pacific Railroad in the operation of CTC and needs no detailed statement from me or anyone else.

"You, to my knowledge, have never been examined on the Uniform Code of Operating Rules effective May 1, 1950 and are not qualified to instruct anyone on the operation under the Uniform Code of Operating Rules.

"You are required to instruct Control Operators on the operation of the CTC board only.

"Effective at once, you must not instruct any operator, or any operator must not accept instructions from you or anyone else which is contrary to the Uniform Code of Operating Rules.

"Please be governed accordingly."

The evidence bearing on the events of the day of the collision shows that the train crew operating the train involved in the collision brought some empty freight cars from Houston to Angleton. Mr. W. E. Smith was the conductor in charge. He is one of the appellants. At least some of the cars were placed on a siding called "Dow Siding". It is located west of the highway crossing where the collision occurred. The train in going to the siding had to pass in-

terlocking A-block 3203. The effect of it passing this signal block was to make both the lower and upper discs show red. As the train passed the depot at Angleton on its way to Dow Siding, Mr. Smith got his work orders. At some near point he went to the telephone and called the CTC operator at Vanderbilt for "track and time". He talked to a Mrs. Phillips, a CTC operator, who gave him track and time until 4 a. m. from the South Danbury to South Angleton (also called North Edmond) stations. Mrs. Phillips then set the board at CTC to show all signals red. There is also sufficient evidence from which it may be reasonably inferred that she thereafter made no changes in the signals so as to give the train a lunar color on the lower disc at A-Block 3203. The crew then took the train to a team track some distance past the crossing. There it picked up four gondola cars that were to be placed on a siding west of the crossing. The gondola cars were being pushed by the engine, they being in front of the engine. These cars varied in length but together they measured, as estimated, from about 215 to 225 feet. They were of low silhouette, were painted black, and some evidence of probative value showed the stationary headlight on the engine shone above them and cast dim, if any, light directly on them. Several hundred feet east of the crossing, the exact distance not being shown, the crew left the train standing and went to the Taco House for breakfast. They remained there about 45 minutes. The crew then mounted the train and proceeded westward. There is a dispute in the testimony as to the condition of the lower disc on A-block 3203 as the train approached. There is sufficient evidence of probative force, however, that it was red as was the upper disc. There is evidence from some members of the crew that when the train was several hundred feet from the crossing the flasher signal at the crossing was working. They purported to see the reflection from the side as they approached. If the discs on this A-Block were red over red the flasher signal could not have been working until after the head of the train

crossed the activation point at the A-Block. The train under the undisputed evidence did not stop at the A-Block. The speed at which it was moving immediately prior to the collision and as the train approached has been variously estimated. It was estimated as moving 1 to 2 miles per hour, 4 to 5 miles per hour, and a member of the State Highway Patrol, who came to the scene of the accident immediately following it, stated the engineer told him it was moving at 10 to 12 miles per hour at the time of the collision. As the train approached the crossing one of the brakemen got off and proceeded at rapid pace to the crossing. He had a white lantern. From the edge of the pavement he looked north and saw no automobiles approaching. He looked to the south and saw some headlights approaching from down the road. He could not estimate the distance but stated he felt the train could clear the crossing before the automobile arrived. He did not flag the crossing but signalled the engineer to come ahead. Just as he mounted the ladder or step on the lead end of the lead car the collision occurred. He did not see the car after first observing it down the highway. No crew member admitted seeing the car except as "a flash" just prior to the collision.

The point of impact was shown to have been in the lane of traffic next to the center line of the highway as the car proceeded north. The front of the car hit the front step on the lead end of the lead gondola car on the south side. Two gondola cars were derailed. The mark evidencing the beginning point of the derailment was a number of feet west of the center line. The cars proceeded on west where they were derailed on the west side of the highway. The train went 65 feet after the collision before stopping. There were no skidmarks indicating any effort by the driver of the automobile to stop. An expert witness testified as to speed, basing his opinion on the damage to the automobile and train. The highway patrolman also gave his opinion. They gave as their

opinion that the automobile was going 50 miles per hour. He was in a 30 mile zone. The highway patrolman also testified, however, that the same amount of damage could be done in a collision such as this if the speed of the automobile was 20, 30 or 40 miles per hour. On speed, appellants introduced a young man named Wehrly who on the morning of the collision was returning from a date he had at Lake Jackson. He was traveling on the "Old Clute Road" to the west of Highway 288 which parallels said highway. The two were estimated to be about 300 yards apart at that point. About a mile from the railroad he looked toward the Highway 288 and saw only one automobile. He had just come out of a dense fog and was going about 50 miles per hour. He decided to increase his speed and catch up with the automobile. He caught up with it and he was going between 70 and 75 miles per hour. He followed the car about ½ mile and then turned on the "Old Cemetery Road" at the bowling alley. That is the last time he saw the automobile. He drove about 300 feet to Highway 288 and stopped for a stop sign. About that time he heard a loud crash. He went down the highway to the point of the collision. As he approached he could hardly see the black railroad cars. He testified he had seen, while he was on Old Clute Road, the flasher signal at the crossing on Front Street, one block west of the crossing on 288. The flasher signals at both crossings, other evidence showed, were wired to come on at the same time. The witness was impeached by a prior inconsistent statement concerning his observation of the flasher signal on Front Street. Also he was impeached by a prior statement that as he neared Cemetery Road he had slowed down because he had run into some fog which was between him and the Front Street crossing. He testified when he caught up with the car he was going 70 miles per hour. He was unable to identify the automobile as the one he had speeded up on so he could catch it as the car involved in the collision. Between the Old Cemetery Road and the crossing there were several roads leading off to the east from Highway 288 where the automobile could have turned. He could not say whether the automobile turned off. He could not say what kind of an automobile it was or how many persons were in it.

There were some other witnesses who did not see the collision but who came to the scene very shortly afterward, and they testified the flasher signals were working when they arrived at the scene. At this time, however, the train was at a point past the mid-line of the highway. One witness testified he arrived momentarily after hearing the noise made by the collision and did not see the flasher signal working.

There is evidence that as the train moved to the crossing after the brakeman signalled it to come on, the engineer gave two short blasts on the whistle. There is evidence the bell on the engine was ringing. However, there is also evidence from witnesses who described what they heard immediately before the collision, such as the noise caused by switching movement and they did not state in their testimony that they heard a bell or whistle.

Mr. Waigand, who formerly worked for the defendant Company, and who wrote the letter above set out to Mr. Heidemann, testified about the operation of the flasher signal. He stated that standard practice recognized a four second lag between the time the flasher signal was activated and the time the train reached the activation point. Too, he stated the activation point about 2700 feet east of the crossing was designed to give travelers a 20 second warning of the approach of trains, that is, in addition to the four second lag it was contemplated the flasher signal would be working for 20 seconds before the train would reach the crossing. On July 8, 1961, he made an observation of a train moving across the highway. When the discs were red over red the train passed the activation point 64½ feet east of the crossing and the flasher signal did not come on until the foot board of the engine was over

the curb. Other evidence had shown there had been no change in the signal system since the collision. The engine was going not much over walking speed. The engine had been stopped back of A-Block 3203. When he wrote the letter to Mr. Heidemann he definitely had A-Block 3203 in mind. He acknowledged receiving the above quoted letter from Mr. Hobbs which was in reply to his letter to Mr. Heidemann. Thereafter trains passed through red lights at this block. There was a hand control at the block that could be used to start the flasher signal. Mr. Waigand, sometime prior to the collision, had been discharged by the defendant Railroad for insubordination.

Mr. W. L. McKinney worked for defendant Railroad at Angleton. He had worked for this railroad 22 years. He, at the time of trial, was a CTC operator. When a train comes to an A-Block where the discs are red over red it is supposed to stop and then proceed slowly. Before Mr. Hobbs' directive a clear signal had to be obtained. In 1957 Mr. Hobbs came to Angleton and gave them rules and told them about "track and time". He told the operators that when a train had track and time they should stop giving them clear signals. We suppose this testimony is reasonably susceptible to the construction that where a train was on track and time that Mr. Hobbs instructed the operators not to give a clear signal but the train on track and time could proceed slowly through the red signals after first stopping. In this way switching could be done faster because a crewman would not have to take the time to go to a telephone and call CTC for a clear signal.

Mr. Hobbs in effect stated his directive applied only to ordinary A-Blocks and not to interlocking blocks. Too, he stated the directive and rules referred to in it did not authorize running any red signal without first stopping. The directive merely had to do with red signals at switches. The switches could be aligned manually.

Mr. Heidemann, the signal supervisor, testified the activation point for the flasher signals was set back far enough to give 20 seconds warning before the train would occupy the crossing. He testified this A-Block was not in track and time territory so the track and time limits do not apply to it. If the discs were red over red the train would have to stop and get clearance. It is not safe to put the activation point only 63 feet (64½) from the crossing. He remembers the letter from Mr. Waigand. He discussed it with Mr. Hobbs. Mr. Hobbs asked him whether if the discs at this signal were red over red the flasher signal would not work until the signal was reached. Mr. Hobbs knew there was a connection between this signal and the flasher signal at the crossing according to the witness. He tried to explain but Mr. Hobbs wouldn't grasp it.

Appellants by their complaint attack the court's action in not granting an instructed verdict, in submitting the basic negligence issues and in not rendering judgment for them non obstante veredicto. These all involve whether there was any evidence of probative force showing that acts were done which constituted negligence by appellants. These are issues and answers attacked:

1. Issue No. 7 where the jury found the railroad and its employees failed to operate the block system as would an ordinarily prudent person.

2. Issue No. 13 where the jury found the discs were red over red as the train approached.

3. Issue No. 14 where the jury found the train failed to stop at the signal and remain stopped until the signal was cleared.

4. Issue No. 15 finding such act was negligence.

5. Issue No. 17 finding Block Signal 3203 was located closer to the highway than was reasonable.

6. Issue No. 19 where the jury found this A-Block was wired in a manner so the flasher signal would not be activated until

the train reached the A-Block when the discs were red over red.

7. Issue No. 20 where the jury found such was negligence.

In this opinion where we discuss no-evidence points we have viewed the evidence most favorably to the plaintiff and only that favorable to her, and where we discuss whether the jury's answers are so against the overwhelming weight and preponderance of the evidence as to be clearly wrong, we have considered all of the evidence both that which militates against plaintiff and that which supports the verdict for her. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

■ While we have not above recited all of the evidence, we feel what we have stated is reasonably to be deduced from the testimony. There were conflicts in the evidence but the jury has resolved those conflicts. We are of the view that the ultimate facts as found by the jury are amply supported by evidence of probative value.

We are also of the view that the answers are not contrary to the overwhelming weight and preponderance of the evidence.

Issues 9, 11, 22, and 23 are also attacked as being without support in the evidence and as being insufficiently supported. By its answer to Issue No. 9, the jury found defendant Railroad failed to give sufficient warning of the approach of the train. By its answer to Issue No. 11, it found Allen Nelson, the brakeman, failed to properly flag the crossing. By its answer to Issue No. 22, it found the Railroad failed to station a flagman on the south side of the crossing and its answer to Issue No. 23 found this to be negligence.

We are of the view that such issues are sufficiently supported by the evidence. From the evidence recited the conclusion could readily be drawn that the automatic flasher system did not work in sufficient time to itself give warning to the traveling public. Too, the conclusion could be drawn that the system as designed was such as to inform the defendant Railroad that such might be the case and that other warning would be necessary. This particularly in light of the fact that the engine was something over 200 feet east of the lead end of the first gondola car; that it was night; that the gondola cars were black and of low silhouette and the headlight of the engine shone over them. The evidence shows that Nelson was on the north side of the crossing at the edge of the pavement. He saw the headlights of the automobile coming. He did not know how far away or how fast it approached, but he merely judged the train could cross. He had a lantern with which he signalled the engineer to proceed, but he did not wave the lantern to and fro to attract attention.

We think, apart from the matter of gross negligence that we will discuss later, the real contention of appellants is that none of their negligence was a proximate cause of the collision but the collision as a matter of law was caused only by the negligence of the driver of the automobile. While, of course, contributory negligence is not in the case since the little girl, to whom negligence cannot here be imputed is suing only for damages for her own personal injuries, a negligent act of the appellants must have been a proximate cause. The attack is that there is no evidence that any act of negligence, assuming negligence, was a proximate cause and alternatively that the jury finding of proximate cause is contrary to the overwhelming weight and preponderance of the evidence.

■ Proximate cause consists of foreseeability and causation. We find no difficulty in finding sufficient evidence to support a conclusion that appellants could have reasonably foreseen that their acts might result in a collision between the train and some one using the highway.

Appellants urge, however, that in fact the only cause of the collision was the conduct of Mr. Rose in failing to heed adequate warning and in the speed at which he was

driving. He was driving in a 30 mile zone. They say the undisputed evidence shows he was driving at least 50 miles per hour. They also urge that the undisputed evidence shows he never saw the train because there were no skid marks, thus showing the absence of any effort to stop.

We have opinion testimony of the highway patrolman based alone on his observation of the damage done that the automobile was traveling 50 miles per hour. He also testified the same damage could have been caused by speed of 20, 30 or 40 miles per hour. Then there is the opinion testimony of the expert, Dr. Tonn, also based on the damage done, that the automobile was traveling 50 miles per hour. There is the testimony of the young man named Wehrly about an unidentified automobile he observed, as we have above detailed, that he said was traveling 70 or 75 miles per hour. By the circumstances above related by Wehrly appellants contend they circumstantially show the automobile he observed was the Rose car. All occupants of the Rose car were killed except the young child, Linda Lou, who remembers nothing of significance about the accident. No one, except some of the train operatives saw the collision or the automobile just before the collision, and they admitted they were in no position to judge the automobile's speed.

■ The highway patrolman's testimony was not competent and is of no probative value on speed. There were no skid marks and he was not shown to have qualified as an expert to determine speed, based alone on damage resulting from a collision, particularly one between an automobile and a heavy gondola car. St. Louis Southwestern Ry. Co. of Texas v. Duffy, 308 S.W.2d 202 (Tex.C.C.A.), ref., n. r. e.; Jenkins v. Hennigan, 298 S.W.2d 905 (Tex.C.C.A.), ref., n. r. e.; Union Bus Lines v. Moulder, 180 S.W.2d 509 (Tex.C.C.A.), no writ hist.; Wallace v. State, 143 Tex.Cr.R. 596, 160 S.W.2d 256.

■ We are also of the view that the testimony as to speed given by Wehrly is without probative value on the issue of speed at any time material to this case. Anderson v. Broome, 233 S.W.2d 901 (Tex. C.C.A.), no writ hist.; Hanck v. Ruan Transport Corp., 3 Ill.App.2d 372, 122 N.E. 2d 445; Morris v. Aero Mayflower Transit Co., 73 Ariz. 390, 242 P.2d 279; Fitzgerald v. Penn Transit Co., 353 Pa. 43, 44 A.2d 288; Huff v. Daniels, 335 S.W.2d 332 (Ky.); Euson v. Starrett, 277 F.2d 73 (7th Cir.); David Bilgore & Co. v. Ryder, 211 F.2d 855 (5th Cir.).

■■ A court or jury is not bound by purely opinion evidence. We certainly cannot say that Dr. Tonn's testimony absolutely establishes the speed of the automobile. Hood v. Texas Indemnity Co., 146 Tex. 522, 209 S.W.2d 345; Metropolitan Life Ins. Co. v. Funderburk, 81 S.W.2d 132 (Tex.C.C.A.), writ dism.; Coxson v. Atlanta Life Ins. Co., 142 Tex. 544, 179 S.W. 2d 943; Tix v. Employers Casualty Co., 368 S.W.2d 105 (Tex.C.C.A.), no writ hist.

■ There is a strong presumption always existing that a person exercises due care for his own safety. Boaz v. White's Auto Stores, 141 Tex. 366, 172 S.W.2d 481.

■ Appellants urge the officer Klasel's testimony that the engineer told him the train was traveling 10 or 12 miles an hour at the time of the collision, though not objected to, is hearsay and without probative force. We think the statement made was admissible as res gestae and thus is of probative force. The record shows the collision occurred at 3:20 a. m. The wrecker driver, who also heard the engineer's statement, arrived between then and 3:30 a. m. Officer Klasel arrived at 3:38 a. m. He testified to making the investigation and as a part of it he talked to the engineer at the scene. The exact time of the conversation is not shown. As stated, it was at the scene where six people had been killed. The engineer on trial said he would not

deny he made the statement as to the speed of the train because he did not remember what he told the officer. From this the conclusion is easily reached that the engineer when speaking was under the influence of the collision, or, to state it otherwise, the event was speaking through him.

■ When we consider all of the evidence it cannot be said as a matter of law that the negligent acts of appellants, as found by the jury, were not proximate causes of the collision. It may be that some negligent act of the driver Rose contributed to the collision, but contributory negligence is not an issue in this case. It may reasonably be concluded from the evidence that though Rose might have been driving in excess of 30 miles per hour, and that he did not stop at the railroad crossing, and he did not hear the bell on the train, none of these was the sole proximate cause of the collision. It may reasonably be inferred that, considering the speed of the train, the flasher signal did not timely operate. Too, the gondola cars were black and of low silhouette and thus were hard to see even by some approaching the scene after the collision though they knew of the collision. The lead end of the lead car, which was the point of collision, was some 215 feet ahead of the engine and the headlight did not illuminate the cars. Too, because of the surrounding lights the headlight could have well been taken for other lights east of the crossing.

■ The issues relating to the negligent failure of Allen Nelson to flag the crossing and that such was a proximate cause of the collision find sufficient support in the evidence. While defendant Railroad Company would not be required to flag the crossing where there is a safely operating flasher system, we feel under all the facts of this case it might be reasonably concluded there was not an adequate flasher system and that flagging was called for.

Appellant, Missouri Pacific, complains of the action of the court in submitting issues on gross negligence and in not disregarding the jury's answers to such issues because there was no evidence to support them.

The jury found that J. B. Hobbs, the trainmaster, caused A-Block Signal 3203 to be operated according to "track and time" procedures and this was gross negligence which was a proximate cause of the collision. The jury also found the practice of "track and time" as applied to this crossing involved an unreasonable risk to the public; that Hobbs had been advised of this danger; that he knowingly refused to discontinue "track and time" as to this crossing; that this was gross negligence and was a proximate cause of the collision.

■ We are of the view there is no evidence to support the finding of gross negligence and that such was a proximate cause of the collision. Assuming that there is some evidence of probative force, based largely on the testimony of Mr. McKinney, that Mr. Hobbs instructed that the "time and track" rules should be applied to A-Block 3203, though it was actually outside of track and time limits, it cannot be said that this was gross negligence. The rules that Mr. Hobbs said to follow called for a train to stop when the discs were red over red and proceed slowly. Too, it is of significance that the undisputed evidence shows the train did not stop at A-Block 3203 as the rules required. The train proceeded through the signal without stopping. Sheffield Division, Armco Steel Corp. v. Jones, 376 S.W.2d 825 (S.Ct.); Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709; Magnolia Petroleum Co. v. Ford, 14 S.W.2d 97 (Tex.C.C.A.), aff'd by Ford v. Magnolia Petroleum Co., 118 Tex. 461, 17 S.W.2d 36.

■ Appellants' complaint that the verdict awarding compensatory damages of $125,000.00 is excessive is overruled. We have read all of the evidence relating to appellee's injuries, and are of the view that it supports the award of the jury.

■ The complaint that appellants' exceptions to appellees' petition should have been sustained is overruled. The excep-

tions in effect asserted that the operating rules and the block signal system as operated could not be the basis of negligence because they were designed only to control operations of their trains to avoid collision with other trains. However, the operation of the block signal system is material insofar as a case concerns injury to the public using a highway across the railroad because it is tied in with and controls the activation of the flasher signal at the highway crossing which is designed to warn the traveling public of the approach of trains.

Our holding that as a matter of law, under the evidence in this case, exemplary damages could not be recovered, requires that the $75,000.00 allowed by the jury be disallowed and the judgment reformed accordingly. The judgment of the trial court is, therefore, reformed so that the appellee shall have and recover compensatory damages from appellants, jointly and severally, in the amount of $125,000.00 with interest thereon at the rate of 6% per annum from the 19th day of July, 1962 until paid. As reformed, the judgment of the trial court is affirmed.