MISSOURI PACIFIC RAILROAD COM-PANY et al., Appellants,

v.

Linda Lou ROSE, by Next Friend, et al., Appellees.

No. 14314.

Court of Civil Appeals of Texas.

Houston.

Nov. 19, 1964.

Rehearing Denied Jan. 7, 1965.

494

Murfee, Hoover & Stillwell, Howard S. Hoover, Monroe Northrop, Houston, Wm. M. McDowell, Gen. Counsel, and Wm. C. Dowdy, Jr., Gen. Atty., both of Missouri Pac. R. Co., Dallas, of counsel, for appellants.

Ralph Gilbert, Ángleton, W. W. Watkins, Curtiss Brown, W. James Kronzer, Houston, Hill, Brown, Kronzer, Abraham, Watkins & Steely, Houston, of counsel, for appellees.

BELL, Chief Justice.

Linda Lou Rose, through her next friend, sued to recover for damages sustained by her because of the loss of her mother and father who were killed June 1, 1961 when the automobile driven by her father was in collision with a train of appellant, Missouri Pacific Railroad Company. The conductor in charge of the train is the other appellant, W. E. Smith. The court, based on a verdict favorable to appellee, rendered judgment in appellee's favor in the amount of $130,000.00.

In the case of Missouri Pacific Railroad Company et al. v. Linda Lou Rose, Tex. Civ.App., 380 S.W.2d 41, we sustained a judgment in appellee's favor for damages she recovered against appellants for personal injuries that she herself received in the collision.

The collision occurred at the intersection of State Highway 288 and the railroad tracks in the City of Angleton. The highway runs generally north and south and the tracks run generally east and west. The collision took place around 3:15 a. m. Mr. Rose was driving his automobile north. The train was proceeding west. The crossing is controlled by flasher signals which, it may be deduced from the evidence, were not working.

The evidence shows that an engine was headed west, pushing four gondola cars ahead of it. The cars were painted black and were of low silhouette. The stationary headlight on the engine shone above the cars, according to some evidence thus failing to illuminate them. The cars, in the aggregate, were from 200 to 225 feet long. The automobile came into collision with the lead end of the lead gondola car. The automobile was being driven in the lane of traffic next to the center line.

The basic theory of appellee is that appellant Railroad was negligent in the manner in which it operated its signal system which was tied in with the activation of the flasher warning at the crossing. The facts are that at a point 64½ feet east of the east curb of Highway 288 is Block Signal 3203. There are two discs on this signal. The upper controls the movement of trains on the main line. The lower controls the movement of other trains. If the two discs show red all trains must stop. This last statement is subject to appellee's contention that Mr. Hobbs, trainmaster, issued a directive in 1957 to authorize crews on "track and time" to ignore these red signals. The activation of the flasher signals at the crossing is tied in with this Block Signal. If the two discs show red, the flasher signals will not be activated until sometime after the lead end of a train passes the signal. The evidence shows that it would normally be activated when the lead end of the train reaches a point 64½ feet east of the highway. There is also evidence to show there is sometimes a lag between the time this point is reached and the time the flasher signals are activated. There was evidence that a 20 second warning should be given the traveling public by the flasher signal at the crossing. Appellee's theory is that on the morning in question the train crew was operating on "track and time"; that it passed through Block Signal 3203 without stopping when the upper and lower discs were red; that the flasher signals did not work; that there was no proper flagging of the crossing and the collision resulted.

The jury convicted appellants of negligence, that proximately caused the collision, in the following respects:

1. There was a failure to operate the automatic signal system properly.

2. There was a failure to properly flag the crossing.

3. The railroad wired the block signal 3203 so the crossing signal would not activate until the train reached or passed it when the discs were red over red.

4. The railroad located signal 3203 closer to the highway than was proper.

5. There was a failure to flag the south side of the crossing.

6. J. B. Hobbs caused signal 3203 to be operated pursuant to track and time procedures.

7. Track and time procedures, as applied by the railroad, required the crew, when on track and time, to pass signal 3203 when the discs were red over red; the crew was following track and time procedure; this involved an unreasonable risk to the public; that Mr. Hobbs was notified of the danger and refused to discontinue the procedure.

8. Appellants failed to give such warning of the approach of the train as would have been given by a person of ordinary prudence in the exercise of ordinary care.

■ In the case cited contributory negligence was not material since appellee there sued for damages resulting from personal injuries to herself and her father's negligence, if any, could not be imputed to her. Here suit is to recover damages resulting to her because of the loss of her parents. The negligence, if any, of her father is therefore material.

Appellants asserted Mr. Rose was negligent in a number of respects and that such negligence proximately caused the collision. The jury, in response to defensive issues, made the following findings, the effect of which was to acquit Mr. Rose of alleged negligent acts:

1. He was not operating his automobile at an excessive rate of speed.

2. He did not fail to keep a proper lookout.

3. His failure to apply his brakes was not negligence.

There then followed these answers to issues submitting phases of Article 6701d, Sec. 86, Vernon's Ann.Tex.St.:

1. The electric signal device was not working and clearly visible at a time when the driver, had he been driving said car as a reasonably prudent person, could have brought said automobile to a stop within 50 feet, but not less than 15 feet from the nearest rail.

2. That the train was not plainly visible and in hazardous proximity to the crossing at a time when the driver, had he been driving the car as a reasonably prudent person, could have brought said automobile to a stop within 50 feet, but not less than 15 feet from the nearest rail.

3. That as the train approached the crossing the horn or whistle on the engine was not emitting a plainly audible signal.

4. That as the train approached the crossing the automatic bell was emitting a plainly audible signal giving warning of the approach of the train.

5. That the failure of the driver of the car to heed the warning given by the automatic bell was not negligence.

Appellants complain that there is no evidence to support the submission to the jury of Special Issues 1, 5, 6, 8 and 27. These issues deal generally with the operation of the flasher warning signal at the crossing, as above reflected by the jury's answers. Too, appellants contend the jury's answers to the issues are so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. The same points are made with regard to Special Issues 2, 7, 9 and 28, which are the proximate cause issues relating to the above negligence issues.

■ We will not set out the evidence relating to these issues but for a fairly extensive statement of the evidence will

merely refer to our statement of it given in the opinion above cited involving the previous trial. We have read the entire statement of facts filed in this appeal consisting of over 800 pages. We conclude there is evidence of probative force to support the submission of Issues, 1, 2, 5, 6, 7, 8, 9, 27 and 28. Also, we are of the view that the answers of the jury to none of the issues can be said to be so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. We make the observation that essentially the evidence given on the trial of this case was the same in all material respects as on the previous trial. It is true that in this trial most of appellants' witnesses exhibited a clearer recollection in their own minds of events than in the first trial and testified for the most part favorably to appellants. However, apart from this more favorable testimony, there remains substantive evidence of probative force supporting the submission of the above issues. Insofar as we have the question of whether the answers are so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong, it is to be observed that the substantive testimony of those witnesses favorable to appellants was so weakened by the introduction of their previous trial and deposition testimony that one cannot say the great weight and preponderance of the evidence overwhelms against any of the jury's answers to the above issues.

■ The conclusion could be reached that signal 3203, tied in as it was to the activation of the flasher warning signal at the crossing, particularly when the discs on the signal were red over red, was located too close to the crossing. The conclusion could be reached that on the occasion in question the discs showed red over red as the train crew approached the signal. The undisputed evidence shows the crew did not stop the train at the signal before proceeding. In the light of this, testimony concerning the speed of the train, testimony

that a twenty second warning to a motorist was deemed proper, testimony of a lag between passing of the train over the activation point and the actual activation of the crossing signals, warrants the inference that the crossing lights were not timely activated.

The conclusion could be reached that all of these facts constituted negligence and that appellants could foresee that collisions might result at the crossing. Too, the evidence shows that there was a locker plant between the train just east of the crossing that obscured the view of the train crew as it looked toward the highway to the south from which direction Rose was coming and of course this would necessarily also obscure Rose's view. Further, four gondola cars aggregating some 200 feet in length were being pushed ahead of the engine. They were painted black, were of low silhouette and were in no way lighted. While there was a stationary light on the engine shining west, it failed to illuminate the cars. Too, because of the tall lights a short distance east of the crossing the light from the headlight tended to blend with the light cast from them. It could well be concluded that all of these facts were causes of the resulting collision and could have been foreseen as probable causes of just such a collision.

Appellants complain there was no evidence to support the submission of Special Issues 19, 20, 22, 22–A, 22–B, 23, 24 and 25, and also the jury's answer to each was so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. These issues submitted generally the appellee's theory that J. B. Hobbs, the trainmaster, in 1957 issued a directive that trains operating on "track and time" need not obey the command to stop issued by the two discs on signal 3203 being red, but could proceed through the signal without obtaining clearance from the C.T.C. operator. These issues are answered favorably to appellee as shown by the answers stated above in this opinion as num-

bered paragraphs 6 and 7. The same attacks are made with regard to Special Issues 21 and 26, the related proximate cause issues.

■ Having held that there was evidence of probative force, and it was sufficient to support the independent grounds of recovery stated above, it becomes immaterial to our decision whether the issues relating to Hobbs' action find support in the evidence. Tex-Jersey Oil Corporation v. Beck, 157 Tex. 541, 305 S.W.2d 162, 68 A.L.R.2d 1062.

■ As we held when the companion case, which we have cited, was before us, we also hold here that there was evidence to require submission of issues relating to negligence in failing to properly flag the crossing under the particular facts of this case. The evidence was sufficient to support the answers. The same is true of the related proximate cause issues.

Appellants assert that Mr. Rose was guilty of contributory negligence as a matter of law in a number of respects and that each negligent act was as a matter of law a proximate cause of the collision. The attack with regard to each allegation of contributory negligence is that there was no evidence to support the submission of the issues of negligence or proximate cause, and, in the alternative that the answers to the issues were so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong.

■ First, appellants complain that the evidence without dispute shows Mr. Rose was driving his automobile at least 50 miles per hour in a 30 mile zone. The only testimony in the record on the speed of the Rose vehicle was the opinion evidence of Dr. Tonn who based his opinion on the damage done to the vehicle and the train. In the previous trial there was also the testimony of highway patrolmen giving their opinion as to speed based on the damage done. There were no tire marks. We

there held the testimony of the patrolmen was of no probative force because they were not shown to be qualified to give an opinion. On this trial their testimony was excluded and we think correctly so because the evidence in this trial on qualification was different in no material respect. On previous trial we held the testimony of the witness, Wehrly, as to speed, was of no probative force because of the want of identification that the automobile he saw speeding some distance from the point of the accident was the Rose car. On this trial his testimony was properly excluded. The result is that the speed of the Rose vehicle is based solely on the opinion testimony of Dr. Tonn. We hold, as we did in the previous decision, that the jury is not bound by this testimony.

Before passing on the next complaints of appellants, we should notice the evidence bearing particularly on the issues raised.

Appellants say that the undisputed evidence shows the flasher signals were working for from 18 to 33 seconds before the collision. Appellants' witnesses, who testified to observing the flasher signals, all employees of the railroad, except Wehrly, testified that the signals were flashing before the lead end of the gondola cars reached the crossing. Allen Nelson, who went to the crossing ahead of the train, stated the signals were flashing when he signalled the train to come across. Some of the crew testified the signals were flashing several hundred feet before the train reached the crossing. They were the same witnesses who testified the signal block discs did not show red over red as the train approached. Waddell, the fireman, testified he could see about the length of the train and as the train was near the signal block he saw the flasher signals working. He testified the discs on the signal block as the train approached were double red. If this was true, then the signals would not activate until the lead end of the train reached the activation point about 64½ feet from the crossing.

His testimony is, therefore, subject to the construction that the flasher signal began when the lead end of the train crossed this point. Wehrly, the witness who was driving on Old Clute Road in a northerly direction toward the railroad crossing just west of Highway 288, testified he saw the flasher light at that crossing working. Other testimony showed the flasher lights at the two crossings would be activated at the same time. Wehrly testified he later, after the night in question, retraced his steps of that night from the point he observed the lights working to the point where he heard the noise of a collision, at the same speed he had previously traveled, and that about 33 seconds elapsed. However, Wehrly admitted that because of the fog between him and the crossing it was difficult to see. He said he could not, because of the fog, see the depot at the crossing but he could "make out" the lights. Too, he admitted that two weeks before trial he had told Mr. Gilbert and Mr. Watkins, attorneys for appellee, that the lights he had seen were the block signal lights along the H. & B. V. tracks. He then said he had checked it over in his mind and he now believed he saw the flasher signal at the Front Street crossing.

Apart from the above testimony, there is testimony from Mr. Waigand, the former signal maintainer for the railroad, who helped wire the signals when they were installed in 1945, who testified there was sometimes a lag between the time of reaching the activation point about 64 feet east of the crossing and the time the flasher signals would be activated. This, he said, could be as much as 4 seconds. He also testified that about a month after the collision in question he saw a train stopped at Block Signal 3203 and the discs were red over red. He went to the crossing where the collision occurred and watched the train move forward. He did not estimate the speed but the train started from a stationary position. The flasher lights did not come on until the cowcatcher of the engine was "on" the crossing. We take it this means across the east curb of the crossing. There was other testimony that the signal system was at all times up to the time of trial wired to operate in the same manner as on the date of the collision.

There was also testimony that the railroad contemplated users of the highway should be given a 20 second warning of the approach of trains.

It should also be borne in mind that the engine with its stationary headlight shining toward the crossing was pushing four gondola cars ahead of it. The aggregate length of the cars was between 200 and 225 feet. The evidence shows the headlight did not illuminate them but shone over them. Mr. Wehrly, among others, so testified and he stated the headlight shone through the fog and over the top of the cars. Too, he said as he approached the point of the collision he was a lot closer to the crossing before he saw the gondola cars than when he first saw the headlight of the engine shining through the fog. There is a definite dispute in the evidence as to whether there was any fog. Some evidence shows there were patches of fog around though we do not recall there was fog at ground level at the point where the collision occurred. Too, the cars were of low silhouette and painted black. There were tall lights back east of the crossing. One witness, a deputy sheriff who was purposely going to the scene of the accident, testified he had difficulty in seeing the gondola cars on the crossing though he was looking for the train.

■ We are of the view that the evidence will support the conclusion that the flasher signals did not begin to operate until the lead end of the lead gondola car was at the crossing, or, if there was only a 4 second lag between the time of reaching the activation point and activation of the signals, it would be only 6 feet east of the curb. This last statement is based on the conclusion that the train was

traveling 10 miles per hour or 14.6 feet per second, as some evidence shows.

Appellant attacks the submission to the jury of the following issues on the ground there was no evidence to support them. We give the substance of the issues and the jury's answers.

Issue No. 31.—The jury answered Rose did not fail to keep such a lookout for the approach of a train as would have been kept by a person of ordinary prudence in the exercise of ordinary care.

Issue No. 33.—The failure of Rose to apply his brakes immediately before the accident was not negligence.

Issue No. 35.—The electric signal device was not working and clearly visible at a time when the driver of an automobile, had he been driving said car as a reasonably prudent person would have been driving said car under the same or similar circumstances, could have stopped said automobile within 50 feet or less than 15 feet from the nearest rail.

Issue No. 37.—The train was not plainly visible and in hazardous proximity to the crossing at a time when the driver of the automobile, had he been driving said car as a reasonable prudent person would have driven it under the same or similar circumstances, could have brought said car to a stop within 50 feet but not less than 15 feet from the nearest rail.

Issue No. 39.—The train, as it approached the crossing, was not emitting a plainly audible signal from its horn or whistle.

Issue No. 43.—The failure of the driver to heed the warning given by the automatic bell of the engine as the train approached the crossing was not negligence. In connection with this issue it is to be remembered that the jury found in answer to Issue No. 42 that the automatic bell on the engine was emitting a plainly audible signal giving warning of the approach of the train.

■ We cannot say as a matter of law that there was no evidence to support the submission of the issues as to whether Rose failed to keep a proper lookout or whether it was negligence for him to fail to apply the brakes. The same is true with regard to the related proximate cause issues.

■ The jury could under the testimony have well reasoned that Rose saw the headlight of the engine but could not see the gondola cars ahead of it. It could be reasoned that at such time the flasher signals had not commenced to work so that the gondola cars were east of the crossing and could not be seen. There is nothing except the fact of the collision that remotely suggests Rose did not see the train. However, when all the surrounding facts are considered, it may well be reasoned he saw the engine but could not see the cars but that the engine, proceeding at about 10 miles per hour, was something over 200 feet east of the crossing. Even if the flasher signal came on when the lead end of the lead gondola car reached the crossing, the jury could have reasoned that the cars could not be seen. Rose could still have seen the engine headlight and it would be at least 200 feet east of the crossing. If it was going 10 miles per hour, it would not reach the crossing for at least 13 seconds and would not reach Rose's lane of traffic for 14 seconds. Because of all surrounding circumstances, the jury could have reasoned that Rose saw the engine and because of its location, and not being able to see the gondola cars, thought as a reasonably prudent person that he had plenty of time to clear the crossing with time to spare. A simple mathematical calculation will show this to be true. The probability is that Mr. Rose was 88 feet from the nearest rail of the tracks when the flasher signals came on and the lead end of the lead gondola car was at the east curb but the gondola cars could not be seen. At that time the engine was 200-plus feet east of the crossing proceeding at 10 miles per hour. If Mr. Rose was traveling

at 30 miles per hour he would have cleared the north rail of the track and be safely north of it in about 2½ seconds. This is based on his traveling at 44 feet per second. To get to the east part of Mr. Rose's lane of traffic it would have taken the engine 14 seconds. If he was traveling 40 miles per hour, he would have been 108 feet from the nearest rail and could at the speed of 59 feet per second have easily cleared the railroad track before the part of the train it is reasonable to suppose he saw reached his lane of traffic. This will serve to demonstrate that the jury's answers, that Rose did not fail to keep a proper lookout and it was not negligence to fail to apply his brakes, are supported by evidence of probative force and that the answers are not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong.

As we recall the evidence, it does not show that the horn or whistle was emitting a plainly audible signal as the train approached but that the engineer merely gave two short sounds of the whistle in recognition of Nelson's signal to proceed. There was other evidence from witnesses who stated all they heard was noise sounding like the rattle of a moving train.

The jury found that the bell on the engine was emitting a plainly audible signal as the train approached the crossing, but it was not negligence for Rose to fail to heed it. The issues were not submitted, apparently, in the form contemplated by Subdivision (c) of Article 6701d, V.A.T.S., which deals with the duty of a motorist to stop when the engine within approximately 1500 feet of the crossing emits a signal audible from such distance if the engine by reason of its speed or nearness to the crossing is an immediate hazard. Rather it was apparently submitted on the theory that the defendant railroad was complying with the requirements of Article 6371, V.A.T.S., in that the bell was ringing for 80 rods before reaching the crossing and this was designed to give motorists' warning of the approach of the train and Rose

was negligent in not heeding the warning. However, the point is briefed on the theory that under Art. 6701d(c) the train was emitting an audible signal, was within 1500 feet of the crossing, was by reason of its nearness to the crossing an immediate hazard and there was a duty on the part of Rose to stop within 50 feet but not nearer than 15 feet from the nearest rail.

The Supreme Court in the case of Missouri-Kansas-Texas R. R. Co. v. McFerrin, 156 Tex. 69, 291 S.W.2d 931, had occasion to review the meaning of Article 6701d, Sec. 86. The effect, we think, of that decision was to hold that the duty to stop an automobile within the given range arose only if the conditions prescribed by a given subdivision existed. However, in determining whether or not the particular facts existed upon which the duty to stop arose, the common law standard of the reasonable, prudent person was applied. Under Subd. (c) the mere fact that the train was emitting an audible signal and was within 1500 feet of the crossing does not give rise to a duty to stop. The duty to stop arises only if, considering the speed of the engine or its (the engine's) nearness to the crossing, it is an immediate hazard. It will be noted Subd. (c) refers to the position of the engine. In determining whether because of its speed or nearness to the crossing it is an immediate hazard we apply the common law test. The question is whether a reasonably prudent person in the exercise of ordinary care under all existing surrounding facts would conclude the engine, or train if a part of the train be between the engine and the crossing, could be seen, was an immediate hazard. Of course, there will be cases where under the particular facts it can be said as a matter of law that it was an immediate hazard. This is no such case. The mere fact that a collision occurred does not establish it as a matter of law. Missouri-Kansas-Texas R. R. Co. v. McFerrin, supra.

Under the facts above recited, Rose, if he heard the signal, could as a reasonably

prudent person in the exercise of ordinary care, considering the position of the engine east of the crossing, its speed and the fact that the gondola cars could not be seen, have concluded the train was not an immediate hazard but that he had sufficient time to clear the crossing. What we say is controlling whether we consider the issues to be a submission under Art. 6701d(c) or a submission with a view to submission under the provisions of Art. 6371.

Issue No. 37 submitted inquiry as to whether the train was plainly visible and in hazardous proximity to the crossing at a time when a reasonably prudent person, had he been using ordinary care, could have stopped within the distances prescribed by Art. 6701d. This issue involves the application of Subd. (d) which was the subdivision involved in Missouri-Kansas-Texas R. R. Co. v. McFerrin, supra.

■■■ We are of the view that there was evidence of probative force to support the submission of the issue and we cannot say the evidence is insufficient to support the jury's answer. Certainly it could be concluded under the facts and circumstances above given that a reasonably prudent person in the exercise of ordinary care could consider that the only part of the train that was visible, that is, the engine, was not at that time, considering its position and speed, in hazardous proximity to the crossing so that no duty to stop arose.

The last complaint concerning the absence of evidence to support the submission of an issue because of the absence of probative force arises as to Issue No. 35 that was submitted under Article 6701d(a), Sec. 86. This subsection provides that the duty to stop arises if "[a] clearly visible electric or mechanical signal * *. * gives warning of the immediate approach of a train."

■■■ While the Supreme Court in Missouri-Kansas-Texas R. R. Co. v. McFerrin, supra, had before it Subd. (d), we think part of the language of the Court amounted to a determination that under any

of the subdivisions whether the facts existed which give rise to the duty to stop should be determined by the conduct of a reasonably prudent person in the exercise of ordinary care. The effect of appellants' contention is that if there is an electric signal device working, this, without more, gives rise to the duty to stop. We reject this contention. Even though the signal device may come on, the train may be at such a distance and traveling at such a speed that a reasonably prudent person in the exercise of ordinary care would suppose under all facts and circumstances the clearance of the crossing could be made. It is a matter of almost common knowledge that ordinarily from the time a flasher signal comes on a substantial number of seconds elapse before the train reaches the crossing. In this case under the evidence the defendant railroad recognizes about 20 seconds' warning should be given to allow motorists to proceed and clear the crossing. Here, as above observed, the jury could have concluded that the flasher signal came on just about 2 seconds before the collision. If it did, the jury could have also concluded Rose was at a point where he could not stop within the range prescribed. Too, it could have concluded that Rose would see the engine 200 feet down east of the crossing and could not see the gondola cars and as a reasonably prudent person in the exercise of ordinary care would suppose he could easily clear the crossing. He certainly would have had it not been for the gondola cars.

We are unable to say the jury's answer is contrary to the overwhelming weight and preponderance of the evidence.

Finally, appellants contend the verdict of $130,000.00 is excessive.

■■■ The parents of Linda Lou, at the time of their death, were 36 years of age: Linda Lou was 8 years of age. She had a life expectancy, according to the table introduced, of 66.20 years. Mrs. Rose, according to the table, had a life expectancy of 39.35 years. Mr. Rose, according to the table, had a life expectancy of 34.76 years. Of

course, tables showing life expectancy are not of themselves determinative of the expectancy of every person and a trier of facts can find a particular individual will probably live for a different number of years.

At the time of his death Mr. Rose worked for a Mr. Toomer who ran a fleet of shrimping boats out of Freeport. Mr. Rose had worked for him about a year. However, Rose had worked several years in the fishing industry. At the time of his death Rose was being paid $125.00 per week. He was working as a dock master. He had been captain of a boat but he wished to have more time to be with his family. A captain in the Freeport area makes from seven to eight thousand dollars per year. Rose was not receiving a bonus at the time of his death, but Mr. Toomer testified a bonus could be expected later. Mr. Rose was buying a boat from Mr. Toomer and the monthly payments to the finance company were $600.00. The boat was operated along with Mr. Toomer's boats. The boat was earning about $600.00 per month. Mr. Rose, who supported his wife and four children, was current in payments on the boat. The boat could be expected, when paid for, to earn net from five to six thousand dollars a year. Mr. Toomer had known Mr. Rose all his life. He was a hard worker. He was devoted to his family.

Mrs. Rose was a fine mother to the children. She took them to church regularly. Mr. Rose did not because of his work. Some of the children were on the honor roll at school. The oldest Rose child was 14 years old. All of the other children than Linda Lou were killed in the collision. The children were well behaved. They were always dressed neatly. Mrs. Rose was not working at the time of her death. She had worked part time as a bookkeeper for Mr. Toomer and he paid her $50.00 per week. Her work was satisfactory.

We will not review all factors to be considered in determining whether a verdict is excessive. They are set out fully in the case of Texas Consolidated Transportation Company v. Eubanks, 340 S.W.2d 830 (C.C.A.), ref., n. r. e. We are of the view that the verdict is not excessive.

There are other points raised by appellants which we have not discussed. We have considered them and find them to be without merit.

The judgment of the trial court is affirmed.